Justin HAMBRICK, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–11–00083–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

March 29, 2012.

⊕⇒1165

Frances Young Bourliot, Harris Co. Public Defender's Office, Houston, TX, for Appellant.

Alan Curry, Chief Prosecutor, Appellate Division, Patricia R. Lykos, Harris County District Attorney's Office, Dan McCrory, Assistant District Attorney, Houston, TX, for Appellee.

Panel consists of Justices JENNINGS, MASSENGALE, and HUDDLE.

## OPINION

TERRY JENNINGS, Justice.

A jury found appellant, Justin Hambrick, guilty of the offense of felony murder[1] and assessed his punishment at confinement for forty years. In his sole issue, appellant contends that the evidence is legally insufficient to support his conviction.

We affirm.

## Background

Van Cypress testified that on August 1, 2009, he was at his brother's apartment watching a movie along with his mother, girlfriend, and brother's friend, Vincent Sanders. Cypress and Sanders planned to go to a bar and later return to the apartment. As they were preparing to leave, Cypress noticed a "suspicious" car pull up in front of the apartment complex. The car contained appellant and another man, later identified as Eddie Williams. Cypress decided to "[w]ait about ten minutes" before leaving because "these guys just passed by in the car and something [did not] feel right." After ten to fifteen minutes, Cypress and Sanders left the apartment, and Cypress noticed appellant and Williams standing in the apartment complex's laundry room. Williams asked Cypress, "You know where I can get any weed at?" When Cypress replied that he did not, Williams and appellant both brandished firearms. Cypress "pulled [Sanders] out of the way" and ran between two nearby cars. Cypress then attempted to run away from the scene but was struck by several bullets, causing him to fall to the ground. When the gunshots had subsided, Cypress got up and noticed that Williams had been shot and was lying on the ground. Appellant grabbed Williams's firearm and "tried to shoot at [Cypress]

some more," but the firearm "jammed." Cypress then ran into a nearby convenience store, where a police officer noticed his injuries and called for emergency assistance.

Cypress was transported to Hermann Memorial Hospital, where he received treatment for five gunshot wounds. A detective interviewed Cypress, who explained that he was not previously acquainted with appellant or Williams. Cypress also stated that neither he nor Sanders were carrying firearms that night, and he identified, from a photospread, appellant and Williams as his assailants. On cross-examination, Cypress admitted that he had previously been convicted of the offense of carrying a firearm without a license.

Sanders testified that Cypress was the younger brother of his "best friend," Chris Banks, but Cypress was "more of an acquaintance than a good friend." Because of his close relationship with Banks, Sanders wanted to become better acquainted with Cypress, so they decided to go to a bar together. After Cypress had left the apartment and walked into the parking lot, he returned to the apartment, explaining that it looked "suspicious" outside, and he asked if Sanders was carrying a firearm. Sanders stated that he did not have a firearm, and they opted to wait "about five minutes" before leaving. On their way to Sanders's car, they passed two men, one of whom asked, "Y'all know where the weed at?" Sanders replied that they did not, and he and Cypress continued walking to Sanders's car. Cypress then touched his shoulder and said, "Hey, Vincent, get down, get, down." When Sanders turned around, he saw both men holding firearms, heard "two sets of shots" from both men, and noticed that Cypress had been shot several times. Sanders

---

1. *See* TEX PENAL CODE ANN. § 19.02(b)(3) (Vernon 2011).

took cover behind a car, and one of the men told Sanders, "It's not for you." After the shooting subsided, Cypress ran to a nearby convenience store while Sanders called for emergency assistance from his cellular telephone. On cross-examination, Sanders admitted that he possessed marijuana at the time of the shooting and had intended to sell it later.

Houston Police Department ("HPD") officer D.C. Lambright, a crime scene investigator, testified that he was asked to investigate appellant's car after the shooting. Lambright discovered a firearm and a "knit ski mask" on the back seat of the car, and he noted that the firearm was "unloaded" with "no rounds" and "no magazine." Lambright swabbed the firearm for DNA evidence and attempted to "lift any possible fingerprints."

HPD officer M. Miller testified that he was dispatched to Memorial Hermann Southwest Hospital to investigate a potential homicide, where he found the body of Williams, who was deceased. Miller interviewed appellant and Antoine Porter, who had transported Williams to the hospital. Appellant then took Miller to the car that he had driven to the hospital. On their way to the car, Miller saw a red ski mask "discarded on the ground in the parking lot," which appellant admitted belonged to him. Appellant told Miller that "they were at an unknown apartment complex in an unknown part of town when [Williams] ... saw somebody" who did not like him. Appellant stated that this person "opened fire on them," but Miller noticed numerous "inconsistencies" between appellant's and Porter's accounts of the shooting. Appellant gave Miller consent to search his car, which Miller had transported to a "more secure facility."

The next day, Miller received information "linking up a case that was similar to" his investigation concerning Williams, and he then interviewed William Banks, Cypress's brother. Miller recovered from the apartment complex where Cypress had been shot a videotape recording, which revealed that appellant's car entered the apartment complex "just before" Cypress was shot. Miller determined that Cypress and Williams had been shot during the same incident, so he visited Cypress at the Hermann Memorial Southwest Hospital in order to interview him. Cypress identified appellant and Williams as his assailants in two separate photospreads. Miller was then contacted by Williams's mother, and he asked her to call appellant and record the telephone call. Miller, who was present during the telephone call, heard appellant say, "I told you I think it came from my tool," which Miller interpreted to mean that appellant had shot Williams. Miller also noticed that appellant's version of the events recounted to Williams's mother "was completely different from" from his original statement to Miller. For example, appellant told Williams's mother that Cypress and Sanders were unarmed. Miller also explained that police officers recovered a second firearm from a dumpster located in between the scene of the shooting and Hermann Memorial Southwest Hospital.

On cross-examination, Miller explained that, although Cypress identified appellant as having been at the scene of the shooting, he mentioned that appellant "was not ... who was shooting at him." Miller admitted that he never tested Williams or appellant for "gunshot residue" and Sanders was never able to identify appellant in a photo spread.

Williams's mother, Yvette Williams, testified that Williams and appellant had been friends since the sixth grade. After she learned that her son had been shot and killed, she eventually called HPD to inquire whether she could help with the

investigation. A detective suggested that she call appellant and record the conversation, and she complied. The prosecutor then offered Yvette's recorded telephone conversation with appellant into evidence. In the conversation, appellant said, "I think it came from my tool," and Yvette understood "tool" to mean a firearm. Appellant also told her that the other men involved did not have firearms and he had disposed of his and Williams's firearms after the shooting.

Dr. Sara Doyle, a medical examiner at the Harris County Institute of Forensic Sciences, testified that she performed an autopsy on Williams's body, which revealed that he had suffered from "a gunshot wound that involved his right arm and his torso." Doyle determined that the bullet "entered through the back of his right arm, came out the back of his right arm and reentered the right side of his back." From this analysis, Doyle opined that the bullet came from Williams's right side "slightly from his back to front."

Appellant testified that he had known Williams, who was his "best friend," for about seven years. Prior to the shooting, appellant met with Williams and Porter, intending to purchase marijuana. The men drove to a nearby apartment complex, where Williams claimed that "he knew somebody" who sold marijuana. Williams determined that the person that he knew was not at the apartment complex at that time, so the men stopped in the apartment complex parking lot to determine where they should go next. At that time, they saw Cypress "standing at the corner," and, when Williams asked Cypress if he knew someone who sold marijuana, Cypress answered affirmatively. Cypress then went into an apartment and returned with Sanders. Williams again asked if they sold marijuana, but "one thing led to another and [Cypress and Sanders] started shoot-

ing." When appellant noticed that Williams had been shot, he asked Porter to assist him in carrying Williams to the car and transporting him to a hospital. Later, he received a call from Yvette Williams, and, when she appeared angry that appellant did not do enough to help her son, appellant, in an effort to console her, claimed that he had a firearm, Cypress and Sanders were not carrying firearms, and he had accidentally shot Williams. On cross-examination, appellant admitted that Williams was carrying a firearm at the apartment complex.

## Standard of Review

We review the legal sufficiency of the evidence "by considering all of the evidence in the light most favorable to the prosecution" to determine whether any "rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim. App.1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from the facts. *Williams v. State,* 235 S.W.3d 742, 750 (Tex.Crim.App.2007). However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

## Sufficiency of the Evidence

In his sole issue, appellant argues that the evidence is legally insufficient to support his conviction because the State did

not "prove that Williams's death was 'in furtherance' of the underlying aggravated assault of Van Cypress."

A person commits the offense of felony murder if the person "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code Ann. § 19.02(b)(3) (Vernon 2011). A person commits the offense of aggravated assault if the person intentionally, knowingly, or recklessly causes serious bodily injury to another or uses or exhibits a deadly weapon during the commission of the assault. *Id.* § 22.02(1), (2) (Vernon 2011).

Here, the indictment alleged that appellant

> did then and there unlawfully, intentionally and knowingly COMMIT the felony offense of AGGRAVATED ASSAULT by intentionally and knowingly caus[ing] bodily injury to VAN CYPRESS by using a deadly weapon, namely, A FIREARM, and while in the course of and furtherance of the COMMISSION OF said offense did COMMIT an act clearly dangerous to human life, to-wit: SHOOTING EDWARD WILLIAMS WITH A FIREARM and did thereby cause the death of EDWARD WILLIAMS.

■ At trial, Cypress testified that both Williams and appellant brandished firearms and opened fire on him. This evidence satisfies the elements of the underlying felony of aggravated assault. *See id.* § 22.01(1) (Vernon 2011); *Davis v. State*, 177 S.W.3d 355, 359 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (stating conviction may be based on testimony of single eyewitness). In regard to the shooting of Williams, Cypress and Sanders testified that they were not carrying firearms, and a firearm was recovered from appellant's car. Williams's wound was consistent with the fatal shot being fired "slightly from [Williams's] back." And, appellant, in his telephone conversation with Yvette Williams, stated that a bullet from his firearm struck Williams, and he admitted that Cypress and Sanders were not carrying firearms. Although appellant testified that these comments were made in an effort to console Williams's mother, the jury was entitled to disbelieve this part of his testimony and believe his admissions. *See Williams*, 235 S.W.3d at 750. From this evidence, the jury could have reasonably concluded that appellant committed an "act clearly dangerous to human life" as alleged in the indictment.

■ Appellant argues that his shooting of Williams could not have been done "in furtherance" of the aggravated assault of Cypress as alleged in the indictment because it could not have "further[ed] the aggravated assault." He asserts that "by accidentally shooting his best friend, who was assisting him in the offense, it hampered his commission of the underlying assault." However, section 19.02(b)(3) requires only that one commit, "in furtherance" of the underlying felony, some "act clearly dangerous to human life that results in the death of an individual," not that the individual's death be "in furtherance" of the felony. Tex. Penal Code Ann. § 19.02(b)(3). The jury could have reasonably found that appellant, as explained by him in his telephone conversation with Yvette Williams, accidentally shot Williams though intending to shoot Cypress and Sanders. This "shooting" of a firearm was clearly done "in furtherance" of the aggravated assault of Cypress as alleged in the indictment. It is irrelevant that appellant did not intend to shoot Williams or that

the ultimate result of his action, i.e., the death of Williams, did not "further" the aggravated assault of Cypress. *See Bigon v. State,* 252 S.W.3d 360, 366 (Tex.Crim. App.2008) (holding that defendant's driving in lane of oncoming traffic was done "in furtherance" of driving while intoxicated offense despite defendant's argument that this did not "advance or promote" the commission of the underlying felony); *Lomax v. State,* 233 S.W.3d 302, 305 (Tex. Crim.App.2007) (stating that purpose of felony murder statute is "to make a person guilty of an 'unintentional' murder when he causes another person's death during the commission of a felony"). Accordingly, we hold that the evidence is legally sufficient to support appellant's conviction for the offense of felony murder.

We overrule appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.